UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS ROSS,

        Plaintiff,                            Case No. 1:13-cv-1270

v.                                            HON. JANET T. NEFF

RELIANCE STANDARD LIFE
INSURANCE COMPANY,

        Defendant.
_____/

**OPINION**

        Plaintiff filed this case pursuant to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, seeking reinstatement of his long-term disability (LTD) benefits by Defendant Reliance Standard Life Insurance Company, the plan's claims administrator. Pending before the Court is Defendant's Motion for Judgment on the Administrative Record (Dkt 42), and Plaintiff's opposing "Initial Brief Challenging Administrative Decision" (Dkt 41), with responses and reply briefs (Dkts 44, 45, 48-49). The Administrative Record (AR) has also been filed (Dkts 20-32). Having carefully considered the parties' briefs and the Administrative Record, the Court denies Defendant's Motion, and reverses Defendant's decision terminating Plaintiff's LTD benefits.

**I. Background**

        Plaintiff worked for Denso Manufacturing ("Denso") as a forklift driver in a warehouse, and was covered by a disability benefit plan subject to ERISA.[1] Plaintiff's date of hire at Denso was June 2, 2003, and his last day worked due to disability was August 12, 2010 (AR at p. ID# 135).

---

[1] Plaintiff was 48 years old at the time of the parties' submissions in this case.

The following day, on August 13, 2010, Plaintiff obtained a consultation with Joseph C. Roth, D.O./Physician Assistant John D. Kehl, P.A.-C., of the Delton, Michigan, Medical Center due to chronic and worsening "shaking all over," which had come "on gradually over past 1-2 years" and "gotten worse in [the] last 2-3 months," and was accompanied by pain, an inability to sleep, balance and locomotion deficits, and memory failure during more acute attacks (*id.* at p. ID# 503). Plaintiff states that he was placed on narcotic pain medication, Vicodin, among other medications, and placed on medical disability from employment by P.A. Kehl (*id.* at p. ID# 376, 523). A December 27, 2010 "Dear Employer" disability letter, written by P.A. Kehl, stated Plaintiff's diagnosis as "neurologic disorder, tremor" and prospectively disabled Plaintiff at least through June 1, 2011, stating a "return to work date" of "never" (*id.* at p. ID# 376, 523).

At that time, the plan administrator for Denso's self-funded six-month short-term disability (STD) plan was Matrix Absence Management, Inc., and Matrix approved short-term disability benefits for Plaintiff for the maximum period (AR at p. ID# 386, 388). In a December 17, 2010 letter, Matrix advised Plaintiff that it also administered Reliance's LTD Policy on Denso, and indicated he should consider applying for ongoing benefits thereunder if he thought he would be totally disabled longer than anticipated under the STD benefit plan (*id.* at 388).

Plaintiff applied for LTD benefits, and, on January 11, 2012, received a letter from Theresa Callaway, Defendant's "Integrated Claims Examiner," advising him that Defendant had deemed him "totally disabled from performing any occupation for which you are qualified" and that, accordingly, he would be paid LTD benefits to "2032 or until you no longer meet the provisions of your policy, whichever occurs first" (AR at p. ID# 291, 662). However, on August 22, 2012, Lisa A. Munkelwitz, of Defendant's "LTD Claims Department," wrote Plaintiff to advise him that his LTD

benefits would be prospectively terminated "on February 29, 2013" (*id.* at p. ID# 620-21). The sole enunciated reason for the termination of benefits was: "Based on the medical information within your long-term disability claim file, it appears that your primary diagnosis is that of a mental or nervous disorder," and as a result, his LTD benefits were limited by the 24-month limitation provision in the LTD Policy for "Mental or Nervous Disorders" (*id.* p. ID# 293), which states:

> MENTAL OR NERVOUS DISORDERS: Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months ….

The policy defines "Mental or Nervous Disorders" to include disorders which are diagnosed to include a condition such as:

> (1) bipolar disorder (manic depressive syndrome);
> (2) schizophrenia;
> (3) delusional (paranoid) disorders;
> (4) psychotic disorders;
> (5) depressive disorders;
> (6) anxiety disorders;
> (7) somatoform disorders (psychosomatic illness);
> (8) eating disorders; or
> (9) mental illness.

(*id.* at p. ID# 102).

On October 30, 2013, Defendant denied Plaintiff's administrative appeal of the termination of his benefits (AR at p. ID# 335-341), and this case seeking judicial review followed.

## II. Legal Standard

The parties have stipulated that the de novo review standard applies (Dkt 36). Under this standard, "the role of the court reviewing a denial of benefits 'is to determine whether the administrator ... made a correct decision.'" *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990)).

"The administrator's decision is accorded no deference or presumption of correctness." *Hoover*, 290 F.3d at 809. "The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.*

### III. Analysis

Defendant asserts, and Plaintiff does not dispute that "[t]he sole issue before the Court is whether Plaintiff's disability was caused by or contributed to by a mental/nervous disorder and his claim therefore [is] subject to the mental/nervous limitation provision, limiting benefit payments to 24 months as determined by Reliance Standard" (Def. Mot., Dkt 42, at p. ID# 1311). Defendant argues that the record before the Court unequivocally demonstrates that Plaintiff's claim is subject to the mental and nervous limitation provision in that (1) Plaintiff does not suffer from an organic neurological disorder but rather from a mental/nervous disorder (*id.* at p. ID# 1322); and (2) Plaintiff suffers from a nonorganic psychogenic tremor and a likely conversion and/or somatization disorder, which is referenced in the Policy as a mental disorder and limited to payment of benefits over a period of 24 months during the lifetime of the claimant, and which benefits Plaintiff has exhausted under the policy (*id.* at p. ID# 1324). Further, and in any event, even if Plaintiff does have an organic neurological condition, he also suffers from a psychiatric condition and his disability thus falls within the policy limitation as "caused by or contributed to by" a mental or nervous disorder, such as depression or anxiety (*id.*).

Plaintiff argues, to the contrary, that Defendant has provided no competent medical opinion testimony from any treating or reviewing medical provider to support the application of the "Mental or Nervous Disorders" limitation in its policy (Pl. Br., Dkt 41, at p. ID# 1302). Further, even if

4

Defendant had made the first necessary showing that competent medical testimony supported the factual conclusion that Plaintiff's disability had a "mental or nervous" component, Defendant has failed to make the second necessary showing under its policy language that such a component either "caused" or "contributed to" the disability instead of arising later as a byproduct thereof (*id.* at p. ID# 1305).

Having considered the full record, the Court determines that Defendant's decision to terminate Plaintiff's LTD benefits was incorrect. The medical evidence preponderates to an objective conclusion that Plaintiff's disability is physical, not mental. Moreover, the psychosomatic focus came quite late in Plaintiff's medical course and such symptoms/conditions are suspect as causing or contributing to Plaintiff's disability.

The course of Plaintiff's medical treatment and the records indicate a continuing effort to determine the cause of his symptomatology. That these efforts included medical professionals' consideration and speculation of nonphysical conditions that could be relevant, or related, to their medical determinations, does not compel a conclusion that Plaintiff's disability is excluded from coverage as "caused by or contributed to by a mental/nervous disorder," as Defendant contends.

### A. Plaintiff's Own Medical Records

Defendant argues that Plaintiff's own medical records establish that several of his treating physicians assessed him with having a "disorder which is diagnosed to include a condition" such as a depressive disorder, an anxiety disorder or a somatoform disorder (Def. Reply, Dkt 49, at p. ID# 1383 (footnote omitted)). For instance, Plaintiff was "diagnosed" to suffer from underlying depression and a generalized anxiety disorder as noted by neurologist Dr. Miller in August 2010 (*id.*, citing AR 470-71), as well as a somatization disorder as noted by neurologist Dr. Lorincz in

5

September 2011 and in December 2011 (*id.,* citing AR 560, 574).  Dr. DeJong diagnosed him with a "Mental disor. NOS oth dis [294.9]," which does not exclude mental disorder due to somatic illness (*id.*, citing AR 537).  Her testing further revealed an increasing level of anxiety and she referred Plaintiff for a psychiatric diagnostic interview (*id.* at p. ID# 1383-84, citing AR 1056).  Neurologist Dr. Sridharan expressed the opinion that Plaintiff's neurological symptoms were of psyochogenic nature and his shaking spells functional (*id.* at p. ID# 1384, citing AR 948).  Moreover, he pointed out that Plaintiff admitted suffering from depression and should be assessed for psychogenic movement disorder/conversion disorder as well as receive depression counseling (*id.*).

Plaintiff acknowledges that Dr. Roth referred Plaintiff to a number of other medical professionals for consultation, whose treatment records/reports referenced possible nonphysical conditions (Pl. Br., Dkt 41, at p. ID# 1291-92).  Plaintiff asserts, however, that no medical provider has opined that Plaintiff has a "Somatoform" or "Somatization" disorder, and the numerous medical providers support Plaintiff's position concerning a disability (Pl. Reply, Dkt 48, at p. ID# 1369; Pl. Br., Dkt 41, at p. ID# 1303).  Plaintiff notes that Dr. Miller only "suspected" possible mental or nervous components to Plaintiff's disability, but did not indicate that he so found or diagnosed such components, and Dr. Sridharan similarly speculated that "if" Plaintiff's disability "really is psychogenic" rather than "neurological" that "he should be able to improve" (Pl. Br., Dkt 41, at p. ID# 1303).  The weight of the record supports Plaintiff's contentions.

An August 27, 2010 report from Gary L. Miller, D.O., a neurologist, stated an "impression" that he "suspec[ted]" an "underlying generalized anxiety disorder" with "persistent depression and unresolved grief [father's death]" (AR at p. ID# 471, 908).

On September 22, 2011, Plaintiff met with and was evaluated by Matthew Lorincz, M.D., Ph.D., University of Michigan Medical Center Neurology Department, whose consultation report noted that Plaintiff's "right foot has turned in and his right toes are curled up," that "he is having difficulty with balance, he falls up to two to three times a day," and that he is using a "scooter or a walker" to get around, and "also has a lift chair at home" (*id.* at p. ID# 626). Dr. Lorincz noted that Plaintiff had "more than a year's history going back to August 2010 of … difficulty with a constellation of symptoms that includes tremor, whole body shaking spells, headache, joint pain and worsening back pain" (*id.* at p. ID# 628). Dr. Lorincz indicated the difficulty with a specific diagnosis, stating "I think it would be important to make sure as best as possible that this is not atypical presentation of a parkinsonian disorder or Parkinson's disease" (*id.*), further noting:

> In addition to idiopathic Parkinson's disease, I have discussed that there are other conditions that can look like Parkinson's disease but are not Parkinson's disease and there are number of neurodegenerative disorders, he does not fit those well.

(*Id.*). Dr. Lorincz also indicated that he had discussed the "possibility" that "stress" might be an "underlying factor" in Plaintiff's condition, which he characterized as a potential "diagnosis of exclusion" (*id.*).

On December 15, 2011, Dr. Lorincz again saw, tested and evaluated Plaintiff, describing his ongoing symptomatology as including tremor, imbalance, headaches with migrainous qualities, and gait deficiencies, and noted that while "his diagnosis remains uncertain," "[i]t may well be that he has young onset Parkinsonism," and that "a number of other parkinsonian diseases" were considered, "but he continues to not fit those well" (*id.* at p. ID# 573-74, 631-32).

Dr. Lorincz next saw Plaintiff on March 1, 2012, and again noted that Plaintiff's "tremor and bradykinesia [slowness of movements and reflexes (Pl. Br., Dkt 41, at p. ID# 1295)]" are "somewhat

7

atypical for Parkinson's disease or Parkinsonism," although he continued to treat him via prescribed carbidopa and levodopa, the two medications considered specific and preferred for Parkinson's disease (AR at p. ID# 633; Pl. Br., Dkt 41, at p. ID# 1295). Dr. Lorincz next saw Plaintiff on July 12, 2012, when he again observed that Plaintiff's symptoms were "atypical for Parkinson's disease, but he has responded to carbidopa/levodopa therapy," which was ordered to be continued. He also noted that Plaintiff "still has frequent falls," and further noted that he continues to experience "migrainous headaches" "every other day," and his history included OSA (obstructive sleep apnea), which is being "treated with CPAP" (AR at p. ID# 636-37; Pl. Br., Dkt 41, at p. ID# 1295).

On November 12, 2010, Plaintiff was seen by Sugandhi Sridharan, M.D., Borgess Neurology, whose report stated that: "I do not suspect that he has a primary neurological disorder at this point. If it really is psychogenic with appropriate care he should be able to improve" (AR at p. ID# 948). Dr. Sridharan did not have any "recommendations with regard to treatment or further testing," but referred to Plaintiff as a "very complicated patient" and recommended he be "referred to a psychologist and a psychiatrist for evaluation of his underlying condition" (*id.* at p. ID# 948).

On December 15, 2010, Clinical Neuropsychologist Joy E. DeJong, Ph.D., "Adult Neurology" at mmpc, Spectrum Health, administered a comprehensive battery of neuropsychological tests to Plaintiff, and reported that Plaintiff had put forth "excellent effort" throughout the testing, and that she saw no evidence of "symptom exaggeration or magnification" (AR at p. ID# 382-85; 535-36). She indicated that he evidenced "executive dysfunction across the board with great difficulty on tasks that required mental flexibility, strategy, planning, and organization" (*id.* at p. ID# 384). Regarding the impressions of Drs. Miller and Sridharan, Dr. DeJong stated that her testing provided "no objective evidence" of "psychogenic etiology," while

noting that Plaintiff's "clinical presentation is quite dramatic"; Dr. DeJong concluded by stating that she was "not able to provide diagnostic clarity at this time," and would like to monitor Plaintiff's "cognitive functioning" (*id.* at p. ID# 384). She recommended "repeat neuroimaging" with particular attention "to the frontal lobes and the left hemisphere" of the brain "to rule out any neurological changes on exam" (*id.* at p. ID# 385).

On May 26, 2011, Dr. DeJong again met with, evaluated, and retested Plaintiff on P.A. Kehl's referral, and issued an updated "Neuropsychological Evaluation" describing her findings (AR at p. ID# 533-37). Dr. DeJong noted some "significant decline" in motor performance "suggestive" of some "left hemisphere involvement" (*id.* at p. ID# 535). She further noted that based on the test results she was not comfortable "explaining away" all of Plaintiff's symptoms "to a functional etiology," and she saw no evidence of any "symptom magnification or exaggeration," as there was no "secondary gain" as his disability was accepted and he still wanted to return to work (*id.* at p. ID# 536).

Additionally, early on in Plaintiff's course of evaluation and treatment, Dr. Roth referred Plaintiff to Dr. Fayyaz Mahmood, M.D., of the Neurophysiology Department of Borgess Hospital in Kalamazoo, who conducted an EEG study October 13-14, 2010 to evaluate Plaintiff for "seizure activity" (AR at p. ID# 406-07). Dr. Mahmood's report states that the study found no evidence of seizure activity or potential epileptogenicity:

> This EEG study had recorded one of the patient's event when his right foot, arm trembled, voice was shaky. This lasted for 6 minutes followed by difficulty breathing and coughing. No concomitant EEG changes other than slight muscle artifacts. Based upon the provided information about the events and no concomitant EEG changes, these events are nonepileptic.

(*id.* at p. ID# 407).

9

And on December 1, 2010, in conjunction with the State of Michigan Disability Determination, Plaintiff was seen for an "Adult Mental Status Examination" by Licensed Psychologist Timothy Strang, Ph.D., of Battle Creek, Michigan. Dr. Strang's report states Plaintiff's "Prognosis" as:

> Claimant's primary issues are the undiagnosed tremors and neurological symptoms. He does have some deficiencies in immediate memory, is at risk for falling and has difficulty with generalized weakness on this right side. There are no obvious gain issues present with this individual. I form the impression that he would much rather be employed and is quite perplexed as to why these symptoms are occurring.

(AR at p. ID# 1225-29).

Despite being granted benefits from both Social Security and from Matrix/Reliance, Plaintiff continued actively treating with Dr. Roth and P.A. Kehl. On March 23, 2011, P.A. Kehl again saw Plaintiff and authored a renewed "Dear Employer" disability statement, based on a stated "diagnosis" of "Parkinsonism" (AR at p. ID# 523, 529). In the treatment and examination report of the same date, P.A. Kehl likewise diagnosed Plaintiff with "332.0 Parkinsonism Idiopathic" (*id.* at p. ID# 529).

On August 4, 2011, P.A. Kehl again examined Plaintiff, stating the history of Present Illness as "patient is a 46 year old male who presents with Parkinsons disease" (AR at p. ID# 796). At that time, P.A. Kehl referred Plaintiff to the University of Michigan for neurological evaluation (*id.* at p. ID# 800).

The record does not support Defendant's characterization of Plaintiff's own medical records or that Plaintiff's treating physicians assessed him with having a disorder diagnosed to include a depressive disorder, an anxiety disorder or a somatoform disorder.

B.  Defendant's Medical Experts

Defendant argues that the application of the mental or nervous disorder limitation is also supported by neuropsychologist Dr. Walker and neurologist Dr. Zafar, who conducted independent medical examinations of Plaintiff (Def. Reply, Dkt 49, at p. ID# 1384).  Defendant asserts Dr. Walker opined that given Plaintiff's symptomatology that a somatization disorder was a "very reasonable diagnosis" and noted that emotional factors affected Plaintiff's illness presentation (*id.*, citing AR at 1051, 1055).  And Dr. Zafar diagnosed Plaintiff's tremor as non-organic psychogenic tremor, opined that Plaintiff's cognitive difficulties are non-organic in etiology, and was unable to identify a neurological (physical) diagnosis for Plaintiff's symptoms (*id.,* citing AR at 1134-35).

However, Plaintiff appropriately notes that Defendant's experts do not go beyond speculation in these regards.  Plaintiff notes that Dr. Walker conceded in his first opinion letter to Defendant that he could not go beyond speculating as to the consequences "if" Plaintiff "has a psychological condition," and, in his supplemental opinion letter, only opines that a "somatoform," i.e., psychosomatic, disorder was "likely" (Pl. Br., Dkt 41, at p. ID# 1303; *see* AR p. ID# 1052, 1055).  Dr. Walker's supplemental review report indeed concludes by stating that "the most likely explanation for Mr. Ross' illness presentation is somatoform disorder or volitional behavior motivated by compensation factors" (AR at p. ID# 1055).

Likewise, Dr. Zafar's reports were not definitive, contrary to Defendant's assertions.  His IME report of July 15, 2013 opined that Plaintiff's "cognitive difficulties are likely non-organic in etiology," stating the diagnosis as:

> *Primary*: Non-organic versus essential tremor.  No florid signs of Parkinsonism or conclusive evidence for any other extrapyramidal disorder is felt to exist at this time.  Several inconsistencies were noted on exam (e.g., give-away type weakness on the

> right side, fluctuations in tremor frequency, inconsistent gait). Documented non-epileptic episode.
> *Secondary*: Migraines; (Anxiety, Somatoform disorder considered per Neuropsychology evaluations).

(AR at p. ID# 1134). In his September 4, 2013 Supplemental Report, Dr. Zafar stated that "no current evidence is felt to exist to substantiate an organic basis for [Plaintiff's] symptoms," and that "[u]pdated/independent neuropsychological and psychiatric examinations may be considered" (*id.* at p. ID# 1262).

In stark contrast, as Plaintiff points out, are the medical providers who expressly found Plaintiff to be disabled, and specifically for physical rather than mental reasons, including: P.A. Kehl, who expressly disabled Plaintiff on the basis of a "neurologic disorder," more specifically, Parkinson's disease, or idiopathic "Parkinsonism"; as well as Dr. DeJong (neurological deficits including generalized "executive dysfunction" involving specific brain areas and conversely found no evidence of "psychogenic etiology"); Dr. Lorincz (may well be young onset Parkinsonism or a neurological condition in the Parkinson family of disorders); and Dr. Strang (tremors with neurological symptoms and "no obvious gain issues"), as discussed above.

Further, the weight of the record does not support Defendant's conclusion that Plaintiff's disability was "caused by or contributed to by" mental or nervous conditions, but instead that those conditions, if any, are a byproduct of his disability/neurological issues. As Plaintiff notes, such is specifically indicated by test results administered by Dr. DeJong, where Plaintiff's BAI anxiety score was a routine 11 even after his disability caused him to stop working (December 2010), but thereafter doubled to 22 six months later (May 2011), an increase that Defendant's own reviewing neuropsychologist, Dr. Walker, found to be a "significant increase" (AR at p. ID# 1054). Contrary

to Defendant's argument, the evidence does not support a conclusion that the "caused by or contributed to by" restriction is met.

Having considered the parties' arguments and the full record, the Court determines that Defendant's termination of benefits on the basis of the policy limitation for "Mental or Nervous Disorders" is not "objectively correct." Plaintiff is therefore entitled to retroactive reinstatement of his LTD benefits.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record (Dkt 42) is denied, and the decision of the Plan Administrator reversing Plaintiff's LTD benefits is reversed. An Order consistent with this Opinion will issue.


Dated: June 5, 2015            /s/ Janet T. Neff
JANET T. NEFF
United States District Judge